IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | | |
|---|---|---|
| JANICE LYNETTE COLE, Individually | § | |
| and as Administrator of the Estate of | § | |
| RAYMOND LARRY COLE, Deceased | § | |
| | § | |
| **PLAINTIFF** | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. _____ |
| | § | |
| SOUTHWESTERN CORRECTIONAL, LLC | § | |
| d/b/a LASALLE CORRECTIONS, LLC and | § | |
| LASALLE SOUTHWEST CORRECTIONS; | § | |
| LASALLE MANAGEMENT COMPANY, | § | |
| LLC; BOWIE COUNTY, TEXAS; | § | |
| VERNON D. BOWMAN, M.D., Individually, | § | |
| ASHLEY SPIVEY, Individually; | § | |
| JASON LAMB, Individually; MARLON | § | |
| EBEY, Individually; TIFFANY HILL, | § | |
| Individually; J. HARDEN, Individually; | § | |
| JANNA POOLE-BRESCIA, Individually; | § | |
| and JOHN AND JANE DOES 1 - 10 | § | |
| | § | |
| **DEFENDANTS** | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

### I.
### INTRODUCTION

1.      This is a civil rights action under 42 U.S.C. § 1983 and state law claims action arising

from events that occurred during the confinement of Raymond Larry Cole , deceased, at the Bi-State

Justice Center Jail ("Jail") in September and October, 2020. The jail was operated by LaSalle

Corrections, a private for-profit correctional/healthcare corporation. Defendants caused the death

of Mr. Cole by flagrantly violating his rights under the Eighth and Fourteenth Amendments to the

United States Constitution. This is at least the sixth wrongful death/survival action filed in this Court

against the LaSalle Defendants, which operated the jail for eight years between February, 2013 and

February, 2021.[1]

2.      Defendants' unconstitutional and negligent actions include:

a.      Abruptly withholding Mr. Cole's necessary medications once he was booked into the jail;

b.      Failing to monitor and treat his life threatening condition;

c.      Failing to communicate Cole's medical history to Wadley Regional Medical Center, where Cole was taken twice during his confinement;

d.      Vastly exceeding the nursing scope of practice by unilaterally, and without consulting an advanced medical provider, withholding essential medications from Cole;

e.      Failing to communicate amongst the medical staff at the jail; and

f.      Housing Cole in deplorable and inhumane conditions of confinement.

In doing so, defendants forced Cole to endure needless pain and suffering, causing his death and robbing his surviving family members of their relationship with him.

3.      As this Court in now painfully aware, what happened to Raymond Larry Cole was not an isolated incident. He is the latest victim of a greedy corporate culture that sees inmates as dollar signs and puts profits over people's lives. LaSalle has been neglecting and abusing detainees and inmates for years, disregarding their fundamental constitutional rights, and engaging in other cruel and inhumane acts and practices. Despite the needless deaths of multiple United States citizens, LaSalle refuses to fix the systemic constitutional deficiencies that keep causing them. So long as the corporation continues to profit, nothing changes. This case goes to the very heart of everything that is wrong with the privatization of America's county jails.

---

[1]  LaSalle's contract with Bowie County was terminated effective February, 2021, at which time Bowie County resumed operation of the jail

## II.
## JURISDICTION AND VENUE

4.    This Court has original subject matter jurisdiction over the plaintiffs' civil rights claims under 42 U.S.C. § 1983, pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights).

5.    This Court has personal jurisdiction over each of the named defendants because they either (1) reside in this judicial district, or (2) have sufficient minimum contacts in the State of Texas, and the exercise of personal jurisdiction would not offend traditional notions of fair play and substantial justice.

6.    Venue is proper in this jurisdiction under 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district and/or because all defendants are subject top this Court's personal jurisdiction in this action.

## III.
## PARTIES

A.    **Plaintiffs**

7.    Plaintiff Janice Lynette Cole is a United States citizen and resident of Bowie County, Texas. She is the surviving wife of the decedent, Raymond Larry Cole. She is also the court-appointed temporary administrator of the Estate of Raymond Larry Cole, which was opened under Texas law. She is a plaintiff in her individual capacity and in her representative capacity as the administrator of her husband's estate. In her representative capacity, she is pursuing this action for the benefit of all eligible statutory beneficiaries, including herself and Raymond Larry Cole's adult son, Stephen Mark Cole.

B.    **Defendants**

1.    **The Municipal Defendant**

8.    Defendant Bowie County is a governmental entity and a political subdivision of the State of Texas and is a "person" for purposes of 42 U.S.C. § 1983. Bowie County is responsible for operating the Bi-State Justice Center Jail ("Bi-State Jail"), which sits on the border of Texas and Arkansas in Texarkana and is physically located on both sides of the state line. Bowie County is also responsible for operating a related facility, known as the Annex, which sits on the Texas side of the border. All Bi-State Jail and Annex inmates are entitled to constitutional protections under the Eighth and Fourteenth Amendments, including the right to constitutionally adequate medical care. Bowie County has a non-delegable duty to ensure that the Bi-State Jail and the Annex meet constitutional mandates. Bowie County may be served via its County Judge, the Honorable Bobby Howell, at 710 James Bowie Drive, New Boston, Texas 75570.

9.    In February 2013, and as periodically renewed thereafter, Defendant Bowie County contracted with a private, for-profit correctional corporation, known as Southwestern Correctional, LLC, d/b/a LaSalle Corrections, LLC, and LaSalle Southwest Corrections, to run all aspects of the Bi-State Jail and the Annex, including the provision of medical care to the jail's population of pretrial detainees and post-conviction prisoners. Pursuant to the contract, Bowie County is obligated to conduct monthly inspections of the Bi-State Jail. Although Defendant Bowie County sought to privatize the operation of their jail by delegating its final policy-making authority to Southwestern Correctional, LLC, it cannot contract-away its constitutional obligations and is liable for any unconstitutional corporate customs or policies that resulted in harm to any detainees and inmates confined in the jail.

###### 2.    The Corporate Defendants

10.    Defendant Southwestern Correctional, LLC, d/b/a LaSalle Corrections, LLC and LaSalle Southwest Corrections (hereinafter "LaSalle"), is a Texas Limited Liability Company doing business in this judicial district for purposes of profit. LaSalle is considered a "person" under 42 U.S.C. § 1983. LaSalle manages the day-to-day operations of the Bi-State Jail and the Annex. LaSalle is a final policymaker for Bowie County for purposes of providing jail-related services and meeting the needs of its pretrial detainees and convicted inmates. According to the Texas Secretary of State, LaSalle's registered agent is Tim Kurpiewski at 26228 Ranch Road 12, Dripping Springs, Texas 78620. At all material times, this defendant was acting under color of state law. Regardless of its place of residence, the allegations against this defendant arise from its actions in the state of Texas and in this judicial district.

11.    Defendant LaSalle Management Company, LLC ("LaSalle Management") is a Louisiana Limited Liability Company doing business in this judicial district for the purpose of profit. LaSalle Management is considered a "person" under 42 U.S.C. § 1983 and is the parent company of LaSalle. It is responsible for ensuring that its subsidiary meets its constitutional obligations in running the Bi-State Jail and the Annex. Because LaSalle Management does not maintain a registered agent in the State of Texas, it may be properly served through the Texas Secretary of State via certified mail at Secretary of State, P.O. Box 12079, Austin, Texas 78711. The Texas Secretary of State is then requested to forward service to LaSalle Management's registered agent in Louisiana: William K. McConnell, 192 Bastille Lane, Suite 200, Ruston, Louisiana 71270. At all material times, this defendant was acting under color of state law.

### 3.     The Individual Defendants

12.     Defendant Vernon D. Bowman, M.D. is a United States citizen who, on information and belief, resides in Texas. Defendant Bowman was an agent, employee and/or subcontractor of Defendant LaSalle, and was responsible for providing correctional medical care to detainees at the Bi-State Jail, including Raymond Larry Cole. At all material times, Defendant Bowman was a policymaker for LaSalle and was acting under color of state law. Regardless of his place of residence, the allegations against this defendant arise from actions in the state of Texas and in this judicial district.

13.     Defendant Ashley Spivey is a United States citizen who, on information and belief, resides in Texas. Defendant Spivey was an agent, employee and/or subcontractor of Defendant LaSalle, and was responsible for providing correctional medical care to inmates and detainees, including Raymond Larry Cole. At all material times, she was acting under color of state law. Regardless of her place of residence, the allegations against this defendant arise from her actions in the State of Texas and in this judicial district.

14.     Defendant Jason Lamb is a United States citizen who, on information and belief, resides in Arkansas. Defendant Lamb was an agent, employee and/or subcontractor of Defendant LaSalle, and was responsible for providing correctional medical care to inmates and detainees, including Raymond Larry Cole. At all material times, he was acting under color of state law. Regardless of his place of residence, the allegations against this defendant arise from his actions in the State of Texas and in this judicial district.

15.     Defendant Marlon Ebey is a United States citizen who, on information and belief, resides in Texas. Defendant Ebey was an agent, employee and/or subcontractor of Defendant

LaSalle, and was responsible for providing correctional medical care to inmates and detainees, including Raymond Larry Cole. At all material times, he was acting under color of state law. Regardless of his place of residence, the allegations against this defendant arise from his actions in the State of Texas and in this judicial district.

16.    Defendant Tiffany Hill is a United States citizen who, on information and belief, resides in Arkansas. Defendant Hill was an agent, employee and/or subcontractor of Defendant LaSalle, and was responsible for providing correctional medical care to inmates and detainees, including Raymond Larry Cole. At all material times, she was acting under color of state law. Regardless of her place of residence, the allegations against this defendant arise from her actions in the State of Texas and in this judicial district.

17.    Defendant J. Harden is a United States citizen who, on information and belief, resides in Texas. Defendant Harden was an agent, employee and/or subcontractor of Defendant LaSalle, and was responsible for providing correctional medical care to inmates and detainees, including Raymond Larry Cole. At all material times, she was acting under color of state law. Regardless of her place of residence, the allegations against this defendant arise from her actions in the State of Texas and in this judicial district.

18.    Defendant Janna Poole-Brescia is a United States citizen who, on information and belief, resides in Texas. Defendant Poole-Brescia was an agent, employee and/or subcontractor of Defendant LaSalle, and was responsible for providing correctional medical care to inmates and detainees, including Raymond Larry Cole. At all material times, she was acting under color of state law. Regardless of her place of residence, the allegations against this defendant arise from her actions in the State of Texas and in this judicial district.

19.     Defendants John and Jane Does 1-10 are United States citizens who reside either in Texas or Arkansas. These defendants (whose identities are unknown) were agents, employees and/or subcontractors of defendant LaSalle and were responsible for providing medical care and/or other jail related services to inmates and detainees, including Raymond Larry Cole. At all material times they were acting under color of state law. Regardless of their places of residence, the allegations against these defendants arise from their actions in the state of Texas and in this judicial district.

## IV.
## FACTUAL ALLEGATIONS

### A.     <u>Facts Applicable to All Defendants</u>

20.     In September, 2020 Raymond Larry Cole and his wife Janice Lynette Cole were residents of Bowie County, Texas. Mr. Cole was retired from the Red River Army Depot, was 72 years of age and had no significant criminal history.

21.     Years before Mr. Cole had suffered from a brain tumor which required multiple brain surgeries to treat. As part of those procedures, Mr. Cole's pituitary gland was surgically removed from his brain. The pituitary gland is a pea sized organ located at the base of the human brain. It serves as the "master gland" of the neuroendocrine system, as it monitors and regulates many vital bodily functions through the hormones it produces.

22.     After the surgical removal of his pituitary gland, Mr. Cole was placed on various medications and hormone replacements to compensate for his lack of a pituitary gland. These medications included:

a.     Desmopressin .1 mg tablets. Cole was to take 1/2 tablet daily. Desmopressin replaced the hormone vasopressin, which is normally produced within the body. Desmopressin is used to treat increased thirst and limit urine output in patients who, like Cole, have undergone brain surgery and removal of the pituitary gland.

    b.    Hydrocortisone 10 mg tablets. Cole was directed to take 2 tablets by mouth each morning and 1 tablet every evening and extra tablets as directed. Hydrocortisone, like Desmopressin, is a man-made version of a natural substance known as cortisol, which is produced by the adrenal gland in healthy humans. Desmopressin is prescribed to treat hormone insufficiency in patients like Mr. Cole who no longer have a functioning pituitary gland. Like Desmopressin, hydrocortisone must be taken precisely as directed by the prescriber. Sudden cessation of hydrocortisone can trigger serious withdrawal symptoms, particularly in patients who, like Mr. Cole, have been taking daily doses of hydrocortisone for years.

    c.    Levothyroxine .015 mg tablets, to be taken once daily. Levothyroxine replaces hormones normally produced by the thyroid gland in a healthy person. Having enough thyroid hormone is important for maintaining normal mental and physical activity. Cole was required to take this daily medication for the remainder of his life.

23.    Mr. Cole was also taking a number of other prescribed medications in September, 2020, including:

    a.    Furosemide 40 mg tablets (lasix)taken once daily. Furosemide is a diuretic or "water pill".

    b.    Potassium CL tablet, taken once daily with food

    c.    Ramipril 10 mg capsules, two capsules daily. Ramipril is an ACE inhibitor used to treat hypertension by relaxing blood vessels, thereby lowering blood pressure.

    d.    Testosterone gel 1%, two packets to be applied to the upper arms daily.

24.    Mr. Cole and Plaintiff Janice Lynette Cole rescued and housed stray and abandoned dogs. Another animal advocate reported to authorities that the Coles were not providing sufficient amounts of food to dogs in their possession. Accordingly, Mr. and Mrs. Cole were charged with multiple counts of cruelty to animals (non-livestock) and one count of tampering with evidence.[2]

25.    On the morning of September 30, 2020 Mr. and Mrs. Cole voluntarily surrendered to the Texarkana Texas police department and were booked in at the Bi-State Jail on the fourth floor

[2] As described hereinafter, Mr. Cole did not live to see his court date. Mrs. Cole was later tried to a Bowie County jury on the animal cruelty charges and acquitted. The evidence tampering charge against her was dismissed as well.

of the Bi-State Justice Center. As the COVID-19 pandemic was well underway, the Coles were met by LaSalle medical staff at the jail entrance from the zone 2 elevator at approximately 8:53 a.m. A LaSalle nurse screened the Coles for COVID-19 symptoms, which neither had. Mr. Cole, in the presence of his wife, informed the nurse that his pituitary gland had been surgically removed years before, and it was vital that he take his medications daily. This information was not recorded at that time by nursing staff, which apparently ignored it.

26.     As part of the booking process LaSalle employee and Defendant Jason Lamb conducted a medical intake screening of Mr. Cole. Lamb is an emergency medical technician and not a nurse by training. Mr. Cole informed Lamb, who recorded on the medical screening form, that Cole had undergone multiple brain surgeries, had no pituitary gland, was on hormone replacements, had experienced a cyst on the brain and suffered from hypertension. Thus, LaSalle medical staff had all the information it needed to determine the importance of continuing Cole on his medications and hormone replacements. Given the serious nature of Cole's medical conditions, and the absolute necessity that he continue his daily medications and hormone replacements, steps should have been taken immediately to notify a higher level practitioner to asses Cole's need for continuing medications/hormone replacements. No consultation with providers above the level of EMT level were made.

27.     At approximately 11:00 a.m., and before the booking process was completed, Cole was found unresponsive in a holding cell. He was unresponsive to verbal and physical stimuli, according to LaSalle LPN nurse Janna Poole-Brescia, who assessed Cole at the time. Poole-Brescia also charted that Cole appeared to be suffering from urinary incontinence at the time. As noted above, Cole had been taking Desmopressin for years to address his thirst/urine output issues. There

is no indication that Poole-Brescia (or any other medical staff member) consulted with higher level care providers about Cole, who was sent to the emergency department at Wadley Regional Medical Center. This occurred more than two hours AFTER Cole had informed staff of his lack of a pituitary gland and the importance of him receiving his daily medications and replacement hormones. Yet LaSalle medical staff, including defendants Poole-Brescia and Lamb, took no steps to inform the staff at Wadley Regional Medical Center what LaSalle medical staff already knew about Cole's condition and medications/hormone replacements.

28.    Once at the hospital Cole was worked up for a seizure, then returned to the jail at approximately 3:00 p.m. on the afternoon of September 30, 2020. An emergency room physician at Wadley Regional Medical Center sent Cole back to the jail with a prescription for an additional medication, Levetiracet (Keppra), which is an anti-convulsant.

29.    Once Cole was returned to the jail nurse J. Harden, contacted medical director Defendant Vernon D. Bowman M.D., who issued an order for the Levetiracet. By this time Cole's medical file included the medical intake form, which informed LaSalle that Cole had undergone multiple brain surgeries, had a brain cyst, had no pituitary gland and was on multiple hormone replacements. Either nurse J. Harden, who contacted Dr. Bowman did not inform him of Cole's lack of a pituitary gland and need for daily hormone replacements, or Dr. Bowman was so informed and ignored the information. Cole was simply placed in jail population without any provision for him to continue receiving his replacement hormones. He was now forced to go off his multiple hormone replacements and medications "cold turkey". Forced off of his medications, Cole's body was a ticking time bomb.

30.    Cole did not receive any of his hormone replacements from this point forward. Predictably, his bodily functions began to decline. He was given Levetiracet (the anti-convulsant) twice daily on October 1st, 2nd and the morning of October 3rd. But neither Dr. Bowman nor the nursing staff took any steps to resume giving Mr. Cole his Desmopressin, Hydrocortisone, Levothyroxine, potassium, Ramipril and testosterone gel.

31.    At approximately 9:10 a.m. on October 3rd, Ebey was called to Cole's cell in N-pod. Cole was assisted into a wheelchair and brought to the medical office. He was semi-alert and non-talkative. His right shin and foot were dark red. During this encounter Cole, who was obviously disoriented, stated he does not take medications. Nurse Ebey then called Ms. Cole who confirmed what Cole had told Lamb during the intake process: that Cole does take medications. She then agreed to bring Cole's medications in for verification. Ebey did not consult with any more advanced practitioners, including the nursing director or medical director, concerning a patient known to have no pituitary gland, history of brain surgery, a brain cyst and on multiple medications and replacement hormones who had already been taken to the hospital once in the past three days and who was now disoriented. These issues were well beyond Ebey's scope of practice, yet he consulted no one about them.

32.    Plaintiff Janice Lynette Cole was able to post bond and was released late in the day on October 2, 2020 (a Friday). The following morning, October 3, 2020 Ms. Cole called the jail to check on her husband. The person with whom she spoke with said he must be fine, as they had not heard anything about him. Later that morning nurse Ebey called Ms. Cole from the jail, stating he was worried about Mr. Cole. Ms. Cole immediately gathered Cole's medications and hurried to the jail, where she met with two LaSalle employees, Jason Lamb and Marlon Ebey in the jail lobby.

Lamb is an EMT by training. Ebey is a L.V.N. Ms. Cole provided her husband's medications in the prescription bottles, which identified the prescriber, medications, dosages and instructions for use. Ms. Cole also explained each medication and again stressed the importance of Mr. Cole receiving these medications as directed on a daily basis. This was the second time Defendant Jason Lamb had been told about the importance of receiving these medications since Cole was booked in three days earlier.

33.     Defendants Lamb and Ebey completed 5 Medical Verification Forms for 5 of Cole's existing prescriptions (all except lasix and potassium) during their meeting with Ms. Cole. Lamb verified the prescriptions for Hydrocortisone and Desmopressin. Ebey verified the Ramapril, Levothyroxine and Testosterone gel. Importantly, the prescriptions for all of these medications were recently filled and the bottles contained only a portion of the prescribed amounts- a clear indication that Cole was actively taking these medications as described during his intake. During the meeting Ms. Cole asked whether Cole would receive his medications, and was told by Lamb or Ebey that the medications would have to be approved, and to call back in two hours. Ms. Cole then left the jail. LaSalle policies required that all medical verification forms be placed in the box of supervising nurse Defendant Tiffany Hill, who is an L.P.N. The originals of each medication verification forms were required to be placed in Cole's medical file.

34.     Neither Defendants EMT Lamb nor L.V.N. Ebey made any attempt to contact medical director Bowman about Cole's medications, and Ms. Cole's insistence that Cole had to receive his medicines as prescribed. Nor did Lamb or Ebey contact medical director Bowman to discuss the fact that Cole had been found unresponsive in the jail during the booking process on September 30th, and transported to the hospital.

35.     At 11:15 a.m. on October 3rd Defendant Ebey called LaSalle Director of Nursing Defendant Ashley Spivey to let her know Cole's "situation". D.O.N. Spivey is a registered nurse. According to Ebey's progress notes in Cole's medical file, he explained Cole's history of brain surgeries and spots on his brain, as well as the surgical removal of Cole's pituitary gland to Spivey. He also informed D.O.N. Spivey that Ms. Cole was planning to get Cole out of jail the day after tomorrow (Monday, October 5, 2020). According to Ebey's progress notes, Spivey and he discussed that:

> The only stock med to correlate is his lasix (Foresemide). D.O.N. states this should be ok for the inmate until day after tomorrow when he can get his other regular meds. Now awaiting spouse to bring K & Lasix RX from pharmacy to verify.

36.     Five minutes later EMT Defendant Lamb contacted D.O.N. Spivey about the medications he had verified and to "make aware of the situation". According to Lamb's progress notes:

> Spivey D.O.N. instructed that we could not accept meds from wife due to not being able to verify the actual med inside of bottle. Spivey D.O.N. instructed that we could continue the meds that we have in stock and write orders for them. Spivey instructed that we could give lasix and potassium since we have it in stock after wife brought them in to verify.

Incredibly, LaSalle's Director of Nursing, without consulting medical director Bowman, actually instructed Lamb and Ebey NOT to administer Cole's medications as prescribed unless LaSalle had them "in stock". Only two of Cole's medications were carried "in stock" by LaSalle: lasix and potassium. Neither of those medications treat Cole's endocrine system deficiencies. All of the medications Spivey ordered discontinued did treat Cole's endocrine system deficiencies. Spivey's directions, made without consulting a medical director cost Raymond Larry Cole his life.

37.    When Ms. Cole had brought 5 of Cole's medications to the jail earlier that day, Mr. Cole was out of potassium and lasix pills. Ms. Cole left the jail, had the potassium and lasix re-filled and brought those two bottles to the jail at 12:05 p.m. Lamb completed Medication Verification forms for these as well.

38.    During the evening of October 3, 2020 at approximately 8:30 p.m. LaSalle nurse D. Anderson LVN charted that Cole "refuse" his p.m. medications. The only order in place at this time was for Cole to receive the Keppra (Levetiracet) he had been prescribed as a result of his trip to the hospital on September 30th. LaSalle medical staff has a practice of charting "refused" whenever a detainee cannot take medicine, regardless of the reason. Other cases filed in this Court have revealed that oftentimes "refused" is charted when the detainee is too sick to accept a particular medicine or treatment.

39.    At approximately 9:20 a.m. on October 4, 2020 Defendant Ebey charts that Cole was standing at his sink, stated he felt better, and that Keppra and Lasix were given to him. In fact, Dr. Bowman had issued an order for Cole to receive Furosemide (lasix) daily at 8:00 a.m. that morning. Glaringly absent from Cole's medical file is any indication that Bowen and Ebey discussed what to do about the five other medications medical staff had verified Cole was taking to compensate for his lack of a pituitary gland less than twenty four hours earlier. Thus, Cole's desperate need for his medications was ignored yet again.

40.    By 3:00 p.m. on October 4, 2020 Cole had been without his pituitary medications for more than four days. At approximately 3:05 p.m. nurse Ebey was called to Cole's cell (K-6). Cole was lying on his right side between the bunk and a stool. He had defecated on himself, the stool and floor. His respirations were labored and shallow at 48-50. Cole was placed on a bunk. Medical staff

could not get a blood pressure reading. An ambulance was summoned, but not until 3:30 p.m. While ambulance attendants were removing Cole from the jail he coded. CPR was begun and an endotracheal airway started. He was transported to Wadley Regional Medical Center by ambulance. He was treated there until his death on October 11, 2020. By that time he had been diagnosed with cardiovascular collapse, presumed intra-abdominal hemorrhage, sepsis and pneumonia. Sometime after Cole was transferred to the hospital, and as he lay dying, he was "released" from custody.

41.    LaSalle staff had consulted Ms. Cole multiple times after Mr. Cole was booked in on September 26th. Jail staff knew her cell number and had actually called it to discuss Mr. Cole's medical condition with her. Yet, as in the case of Holly Barlow-Austin in 2019, jail staff, including the named Defendants herein, deliberately decided not to contact Ms. Cole about her husband's dire medical condition or the fact that he had been transferred to Wadley again. Ms. Cole did not learn her husband was near death until it was too late to reverse the damage caused by the deliberate decision to withhold these medications from Cole.

42.    Mr. Cole's serious medical needs, including his need for multiple daily medications and hormone replacements were immediately made known to LaSalle medical staff during his intake on September 30, 2020. Yet multiple agents and employees of LaSalle acted with deliberate indifference to those medical needs in violation of their professional standards of care. These corporate agents and employees had a constitutional and professional duty to act when they became subjectively aware that Cole was suffering from serious medical needs. Their failure to do so put Cole at substantial risk of serious harm and caused or contributed to his unnecessary pain and suffering and death. These acts also deprived Cole's statutory heirs of their relationship with Cole.

43.    The deliberate indifference to Cole's serious medical needs came from each John and Jane Doe defendant. Said defendants were, at all material times, agents and employees of LaSalle, and include all medical personnel on duty at the Bi-State Jail between September 30, 2020 and October 4, 2020 when Cole was rushed to Wadley Regional Medical Center for the second time in five days. The identities of these nurses and other lower level providers in the jail are unknown at this time. Each medical staff employee and agent at the Bi-State Jail during Cole's confinement also violated his basic constitutional right to be housed in humane conditions of confinement and acted in violation of their professional standards of care.

44.    Each of the LaSalle medical staff and providers also acted with deliberate indifference to Cole's serious medical needs and in violation of their professional standards of care. The named defendants and the unnamed members of the jail medical staff all knew of Cole's medical conditions and his critical need for daily medications to treat them. They knew Cole was not receiving his required medications for the entirety of his confinement from September 30th until he was again transported to the hospital on October 4th. All of the named and Doe defendants were personally aware of Cole's repeated requests that he receive his medications. Each had a constitutional obligation and professional duty to treat and dispense medications to Cole but failed to do so.

45.    The deliberate decision by LaSalle director of nursing Spivey was just that: a conscious decision to direct medical staff NOT to give Cole his pituitary related medications and hormones during his confinement. This directive was made with full knowledge that Cole had no pituitary gland, was taking at least four medications and hormone replacements, and had already been transported to the hospital on September 30th during the booking process. Ordering that Cole

not receive these medications, each of which had been verified that morning by LaSalle medical staff was tantamount to an order to execute Cole by removing his daily medications.

46.    As noted above, nursing staff waited approximately one half hour to call an ambulance for Cole on October 4th. As we saw in the cases arising out of the deaths of Morgan Angerbauer and Holly Barlow-Austin, staff should have immediately summoned the ambulance. Moreover, in his chart entries for October 4th, Defendant Ebey admits that Cole had actually been only "semi-alert" the day before (October 3rd). Yet the records reflect that no assessment, including the taking of vital signs, or treatment was provided to Cole at that time. Nor were higher level providers, including medical director Bowman consulted.

47.    The lower level nurses named herein- EMT Lamb, LVN/LPN's Ebey, Hill, Harden and Brescia and nursing director Spivey (and others, including the Doe Defendants) were personally aware of Cole's serious medical needs, and the precise medications and dosages required to treat those needs. The comments of Mr. and Ms. Cole during the booking process and medical intake, the verification that Cole was taking multiple medications to compensate for his lack of a pituitary gland, as well as Cole's becoming incoherent and losing urinary continence on day 1 of his confinement were all warning flags that Cole was reacting adversely to the lack of medications since being placed in the jail. These warnings were all ignored, with predictably catastrophic results. The failure of LaSalle medical staff members (and others) to follow healthcare protocols, to document Cole's medical file, to keep honest and accurate medical records, to administer essential doses of medication, to communicate among one another about their patient, to report Cole's serious medical needs to higher level providers in dereliction of their duties as gatekeepers. Medial staff failed to monitor Cole's medical condition, failed to arrange for more advanced medical care in a timely

manner and failed to even communicate to Cole's wife that Cole had coded in the jail, been given CPR then transferred to the hospital. Nor did medical staff inform Wadley Regional Medical Center of his known and verified prescriptions or anything else LaSalle had learned during his confinement. There is no question that LaSalle medical staff knew how to contact Wadley about Cole's condition, as he had signed a consent for treatment and authorization to release medical information on September 30th. LaSalle medical staff actually faxed Wadley on October 4th after Cole's second transfer to Wadley, asking that LaSalle be provided with documents of his admission on that date. It would have been just as easy for LaSalle to have forwarded to Wadley what LaSalle was well aware of and had documented in Cole's medical file:

a.     That he had undergone multiple brain surgeries;

b.     That he was on seven currently prescribed medications when booked into the jail, at least four of which were taken daily to compensate for no pituitary gland;

c.     The names of the doctors who wrote the current prescriptions;

d.     That LaSalle nursing director Spivey had ordered staff not to administer each of Cole's pituitary related medications;

e.     That Cole was found unresponsive on September 30th and was suffering from bladder incontinence;

f.     That Cole had been semi-alert on both October 3rd and October 4th; and

g.     That Cole was not being properly monitored for his conditions while at the jail.

Had LaSalle medical staff provided this information to the hospital, staff there would have been able to incorporate that information into the treatment plan for Cole. Instead, the hospital was required to "shoot in the dark" as to the specifics, which LaSalle already had in its possession.

48.     Defendant Bowman, as medical director for the Bi-State jail, failed to timely order Cole's known and current medications be continued while in confinement, failed to adequately

communicate with the medical staff concerning Cole, failed to supervise the lower level medical providers on staff, failed to monitor and treat Cole, or even review his file after Cole was transferred to the hospital on two separate occasions over the course of four days. Likewise, Defendant Hill failed to supervise other medical staff, failed to monitor and treat Cole or even review his files. A cursory review of Cole's medical file between September 30th and October 4th would have revealed Cole was not receiving any of his endocrine deficiency medication. D.O.N. Spivey likewise failed to supervise medical staff during the confinement of Cole.

49.    The conduct of the individual defendants alleged herein(as well as the conduct of other unnamed individuals)was committed with intent, malice, deliberate indifference and reckless disregard for Cole's federal constitutional rights and caused the damages described in this complaint. The individual defendants (and unnamed individuals described herein) had a duty to act reasonably, in accordance with the standards of care governing their work. Their conduct described herein constitutes breach of the standard of care and caused Cole and his heirs harm as set forth herein.

## B.    Additional Facts Applicable to the Corporate Defendants

50.    The unconstitutional acts and omissions alleged herein - as well as the inhumane conditions of confinement - were carried out in accordance with the official policies, procedures, practices, and customs of the Corporate Defendants (LaSalle and LaSalle Management). These corporate policies, procedures, practices, and customs, which are described in more detail below, were the moving force behind the unconstitutional actions that led to Mr. Cole's permanent injuries

51.    In the years leading up to 2020, the Corporate Defendants engaged in a pattern, practice, and custom of unconstitutional conduct toward inmates/detainees with serious medical needs, including denying prescription medication, disregarding healthcare protocols that were

designed to protect inmates from harm, failing to conduct state-mandated face-to-face checks on inmates, falsifying observation logs, fabricating medical records, failing to monitor inmates in medical observation cells, mismanaging patient medical charts, withholding important information from qualified medical providers, maintaining a deficient medical record-keeping system, ignoring abnormal vital signs, allowing low-level nurses (LVN and LPN) to practice outside the scope of their medical licenses, failing to conduct essential medical tests and checks, neglecting inmates with chronic medical conditions, downplaying life-threatening symptoms, failing to transport inmates with emergency medical needs to the hospital, and otherwise depriving them of needed medical treatment.

52.     As of the time of Mr. Cole's confinement, there had been multiple instances in the Bi-State Jail/Annex (and in other correctional facilities run by the Corporate Defendants) of inmates being systemically denied constitutionally adequate medical care by LaSalle and its agents or employees. Several of these instances involved high-profile lawsuits about which the Corporate Defendants were acutely aware, including those that were covered by local and national media outlets, putting company policymakers on notice that the Bi-State Jail and other LaSalle-run facilities were engaging in practices that endangered the lives of inmates.

53.     For example, in July 2015, 35-year old Michael Sabbie died in the Bi-State Jail because LaSalle ignored his serious medical needs and failed to take him to the hospital despite his life-threatening medical symptoms. LaSalle staff knew that he suffered from multiple chronic medical conditions, including hypertension, asthma, diabetes, and heart disease. Nevertheless, they failed to give him medication, failed to check his blood pressure and blood sugar, failed to medically monitor him (even after assigning him to a medical observation cell), failed to conduct state-

mandated face-to-face checks, failed to communicate his medical needs to qualified medical providers, and failed to summon or secure emergency medical care for him.

54.     In the leadup to Michael Sabbie's death, LaSalle nurses disregarded healthcare protocols, falsified records, and practiced medicine outside the scope of their licenses. Despite his objectively serious medical signs and symptoms, nurses accused him of faking his medical condition. In addition, LaSalle guards fabricated observation logs - suggesting that they were checking on him when, in fact, they were not doing so - and failed to summon emergency medical care, even when he was plainly dying in front of them. Poor training and inadequate staffing caused or contributed to his death. In a lengthy, 169 page report and recommendation to deny LaSalle's motion for summary judgement, United States Magistrate Judge Caroline M. Craven documented overwhelming evidence of systemic constitutional deficiencies at the Bi-State Jail. *See Sabbie v. Southwestern Corr., LLC*, No. 5:17cv113-RWS-CMC, 2019 U.S. Dist. LEXIS 214463 (E.D. Tex., Mar. 6, 2019).

55.     Even after Mr. Sabbie's death and the well-documented evidence of the systemic constitutional deficiencies that caused it, LaSalle did nothing to fix the problems. The company took no steps to correct the nursing staff's failure to follow healthcare protocols and its failure to meet basic standards of care. Nor did it implement any policy changes to ensure better care for inmates with chronic medical conditions. Incredibly, LaSalle conducted no internal review into the death of Mr. Sabbie. Nothing changed and, predictably, LaSalle's pattern of unconstitutional misconduct persisted.

56.     In July 2016, approximately one year after Michael Sabbie's death, a 20 year old named Morgan Angerbauer died in the Bi-State Jail because LaSalle personnel again failed to follow healthcare protocols, failed to conduct vital medical tests, failed to conduct state-mandated visual

checks, failed to monitor her serious medical condition (despite assigning her to a medical observation cell), failed to give her medication for her chronic medical condition, and failed to take her to the hospital despite her plainly life-threatening medical needs. *See Leigh v. Southwest Correctional, LLC.*, No. 5:17cv129. Despite her objectively serious medical condition, LaSalle nurses accused her of faking it. Once again, poor training, inadequate staffing, and other systemic constitutional deficiencies caused or contributed to this inmate's death. As was the case with Michael Sabbie, LaSalle personnel again falsified records to suggest they were conducting state-mandated visual checks. LaSalle's unconstitutional acts and practices continued.

57.     The following year, in November 2017, an inmate named Juan Jose Cordova-Sanchez died in the Bi-State Jail. While being restrained by LaSalle guards on the ground in a prone position, the inmate became unresponsive. Despite this man's obvious and immediate need for emergency medical care, life-saving measures were not undertaken until it was too late to save his life.

58.     In April 2018, a detainee in the Bi-State Jail suffered a stroke. Despite repeated pleas for help by other inmates, trustees, and family members of the stroke victim, LaSalle personnel, including on-duty nurses, disregarded healthcare protocols and failed to provide any treatment or call an ambulance for approximately 24 hours. Still, LaSalle did nothing to correct the systemic constitutional deficiencies, and the company continued to maintain unconstitutional practices that put inmates at substantial risk of serious harm.

59.     Three months later, in July 2018, a Bi-State Jail inmate named William Jones was severely beaten and injured during his confinement. *See Jones v. Southwest Correctional, LLC*, No. 5:19-cv-00104. Despite his life-threatening medical needs, LaSalle staff deprived him of medication, failed to follow healthcare protocols, failed to monitor his serious medical needs, failed to conduct

face-to-face checks (while documenting otherwise), and failed to arrange for hospital transport in a timely fashion.[3]

60.    Although Mr. Jones was put in a medical observation cell, LaSalle staff conducted virtually no medical monitoring of him. In addition, despite knowing that he suffered from hypertension, LaSalle medical providers took no vital signs—even after he was gravely injured. Nor did they make any effort to provide him with food or water, causing him to suffer from severe dehydration. Instead of arranging for Mr. Jones to be taken to the hospital, LaSalle "released" him to his sister, who had had him transported to the hospital by ambulance. By that time, he was near death's door. He was placed on a ventilator and remained hospitalized for nearly a month. Yet, rather than addressing the constitutional deficiencies that allowed this to happen, LaSalle sought to cover it up by destroying surveillance footage and other relevant information.

61.    In March 2019, an inmate named Franklin Greathouse died while in LaSalle's custody at the Bi-State Jail. Although Mr. Greathouse reported having a seizure, he was not seen by a medical doctor or taken to the hospital. LaSalle medical providers accused him of faking it. He died later that same day from a seizure. Once again, state investigators found LaSalle to be out of compliance with jail standards. After his death, an investigation by the Texas Commission on Jail Standards determined that LaSalle guards failed to conduct the requisite face-to-face checks on Mr. Greathouse—while falsely documenting them in their observation logs.

62.    The following month, April of 2019, Holly Austin-Barlow was incarcerated in the Bi-State Jail and Annex. Over the course of two months, LaSalle jail staff failed to provide her prescribed medications necessary to treat her HIV status. She was denied any meaningful treatment

---

[3]    The Jones case was tried before a jury in this County in May, 2021. That jury returned a verdict in favor of LaSalle.

for her condition, and was not transferred to a hospital until she was near death. She died in June, 2019. *See Mathis v. Southwestern Correctional, LLC, et al*, No. 5:20CV146.

63.     Just four days before the Cole's were booked into the jail 41 year old Albert Wrightner was booked into the Bi-State jail. Mr. Wrightner suffered from multiple medical conditions, including high blood pressure. Despite being informed of Wrightner's condition, and his need for daily medication to treat his high blood pressure, jail medical staff failed and refused to give him medication. After a week of being deprived of his medications, Wrightner lost vision in both eyes. His action arising from those events was filed in this Court on September 26, 2020. See *Wrightner v. Southwestern Correctional, et al* No. 5:22-CV-00126.

64.     Following the death of Holly Barlow-Austin in 2019, Bowie County required that LaSalle implement a definitive system to make sure detainees and inmates whose family brought prescription medications to the jail had those medications reviewed and promptly provided if verified (Austin's husband had brought her life saving HIV medications to the jail-which failed to properly dispense).This is precisely why Defendants Lamb and Ebey were required to completely go over and document the pertinent information contained in the Medication Verification forms they discussed with D.O.N. Spivey on October 3, 2020. Yet despite being instructed by the county to do a better job LaSalle dropped the ball again. The medical director was not consulted about the decision to suddenly withdraw medications Cole had taken daily for years. The decision to withhold these medications from Cole vastly exceeds the scopes of practice for defendants Lamb, Ebey and Spivey. None of them should have made a decision to withhold important medications without the approval of a more advanced medical provider. This was a gross deviation from the professional standard of care.

65.     The above-described incidents occurred prior to Mr. Cole's confinement. In each of these instances, LaSalle staff disregarded basic healthcare protocols, deprived inmates of needed medical care, failed to monitor their medical needs, violated state-mandated visual check requirements, and delayed or denied emergency care or hospital transport even when the inmates were obviously suffering from life-threatening medical complications. Despite each of these tragic outcomes, most of which resulted in death, LaSalle failed to correct the unconstitutional policies, practices, and customs that caused them to happen. And, as expected, the systemic constitutional deficiencies continued.

66.     The unconstitutional policies, practices, and customs described above have not been limited to the Bi-State Jail and have caused unnecessary suffering and deaths in multiple other LaSalle-run Texas facilities. For example, in September 2013, an inmate named Greg McElvy died in the Johnson County Jail, which is operated by LaSalle. Over the course of three days, this inmate exhibited alarming symptoms - he was not eating or drinking; he was vomiting; he lost control of his bodily functions; he was urinating and defecating on himself; and he was suffering from severe respiratory distress. He also had abnormal blood pressure. He repeatedly told jail staff that he was dying and begged for medical attention. Multiple inmates, and one guard, tried to get the LaSalle medical staff to help. However, despite his life-threatening medical needs, he was neither taken to the hospital nor seen by a medical doctor. LaSalle nurses disregarded basic healthcare protocols. By the end of those three days, he was found unresponsive, in a pool of vomit. He died of untreated acute bronchopneumonia and asthmatic complications.

67.     In May 2015, another inmate, Ronald Beesley, died in LaSalle's Johnson County Jail - after complaining of chest pain and experiencing swelling in his limbs. His wife visited him the day

before his death. After observing that he could barely walk and was struggling to talk, she and another family member contacted a LaSalle jail official and expressed concern that he would die without immediate medical intervention. However, LaSalle staff did not take him to the hospital or even have him evaluated by a medical doctor. Consequently, Mr. Beesley ended up dying in jail the following night from an infection in his chest that could have been treated with simple antibiotics. Disregarding healthcare protocols, failing to monitor his medical needs, ignoring his life-threatening medical condition, and refusing to take him to the hospital led directly to Mr. Beesley's unnecessary death.

68.     In November 2015, an inmate named Michael Martinez was found hanging from the ceiling of his cell at the LaSalle-run Jack Harwell Detention Center in Waco, Texas. An investigation revealed that no one had checked on Mr. Martinez in the three hours leading up to when his body was discovered - in violation of state correctional standards. Another inmate, Kristian Culver, died in the same facility seven months later, in May 2016, under similar circumstances. Once again, an investigation revealed that LaSalle guards were not conducting their state-mandated face-to-face checks. Poor training and inadequate staffing also caused or contributed to these deaths.

69.     In 2015-2016, two detainees died in a LaSalle-run jail in McLennan County, Texas. In each instance, LaSalle guards failed to conduct the state-mandated checks and falsified records to suggest their checks had been done. At least one guard admitted that the company had instructed jail staff to falsify inmate observation logs. Similar testimony was elicited in the Michael Sabbie litigation. Poor training and inadequate staffing also caused or contributed to these deaths.

70.     In November 2017, an inmate named Denay Lauren Birnie died in LaSalle's Parker County Jail of a drug-related overdose. Despite her serious medical needs, she was not seen by a medical doctor or taken to the hospital. As with so many others, LaSalle staff failed to monitor her

medical condition. An investigation by the Texas Rangers concluded that falsified checks played a role in her death. In December of the following year, an inmate named Andrew DeBusk died in the same facility after being restrained by LaSalle guards. Even when he was nonresponsive and his face had turned purple and gray, LaSalle guards and a LaSalle nurse ignored his emergency medical needs until it was too late to save his life.

71.     In the years leading up to Mr. Cole's confinement, LaSalle-run facilities in Texas routinely failed inspections. According to Brandon Wood, the Executive Director of the Texas Commission on Jail Standards, LaSalle has had "continual noncompliance issues" in Texas, more than other jail operators in the state. In fact, LaSalle-run jails in Texas have been on the state's noncompliance list every year between 2015 and 2019.

72.     LaSalle facilities have also come under scrutiny by state lawmakers for hiring a disproportionate number of "temporarily licensed" corrections officers - taking advantage of a loophole that allowed correctional facilities to hire and staff their jails for up to one year with guards who hadn't gone through the basic correctional training academy. LaSalle did this purely for monetary reasons and without regard for inmate health and welfare. Hiring these untrained guards was cheaper than hiring experienced guards or paying to send them to the corrections academy for their basic training. The Bi-State Jail actively participated in this reckless, profit-driven scheme.

73.     Not only did LaSalle hire a disproportionate number of these temporarily licensed jailers, but it failed to give them state-mandated on-the-job training. Between 2015 and 2019, LaSalle guards engaged in a persistent pattern of falsifying training records. This occurred in multiple LaSalle-run facilities, including the Bi-State Jail. In the Michael Sabbie case, for example, guards testified that LaSalle literally instructed corrections officers to fill out training records

indicating that their on-the-job training had been completed, when it had not even begun. Similarly, the Texas Commission on Law Enforcement Standards secured more than a dozen sworn statements from guards at LaSalle's Parker County Jail confirming that they did not receive training that the company reported to the commission. Guards from other LaSalle-run jails have given similar accounts to investigative journalists.

74.     In the years leading up to Mr. Cole's confinement, LaSalle had a well-documented practice of failing to adequately train its security personnel on recognizing and responding to the serious medical needs of inmates and detainees. The need for this training was obvious because LaSalle often hired detention staff with little or no corrections experience, and it was foreseeable that the lack of such training would cause harm to inmates and detainees. In fact, the inadequate training of LaSalle jail guards caused or contributed to multiple bad outcomes in the Bi-State Jail prior to Mr. Cole's confinement. In litigation involving both the death of Michael Sabbie and the death of Morgan Angerbauer, for example, multiple corrections officers testified that LaSalle did not even train them that they had a constitutional duty to summon medical care for inmates with serious medical needs. These same training deficiencies played a substantial role in Mr. Cole's unnecessary suffering.

75.     The inadequate training was not limited to jail guards. LaSalle also failed to train its jail nursing staff on how to recognize and respond to the serious medical needs of inmates, follow healthcare protocols, monitor inmates in medical observation cells, conduct medical examinations in accordance with basic standards of care, notify qualified providers of abnormal findings, consult with and involve medical doctors in patient care, correctly maintain and review medical charts, and contact emergency services in a timely fashion. The need for this training was obvious, particularly

in the Bi-State Jail, because there is no doctor on site and because the jail utilizes lower-level nurses (LVNs and LPNs) in inmate-patient care. Indeed, despite their limited scope of license, these LVN/LPNs are often the only ones providing healthcare at the Bi-State Jail.

76.     It was foreseeable that the training deficiencies outlined above would cause harm to inmates and detainees, such as Mr. Cole. In fact, just as the inadequate training of jail guards caused or contributed to multiple bad outcomes in the Bi-State Jail prior to Mr. Cole's confinement, so, too, did the inadequate training of LaSalle LPN/LVNs. In litigation involving both the death of Michael Sabbie and the death of Morgan Angerbauer, for instance, several LaSalle LVN/LPNs testified that they received little to no training and were not even aware of the corporation's healthcare protocols. These same training deficiencies played a substantial role in causing Mr. Cole's injuries.

77.     In addition to its inadequate training, the practice of insufficient staffing has been a well-documented and persistent problem at LaSalle-run Texas jails. In fact, staffing shortages led to several of the constitutionally deficient practices outlined above. For example, one of the reasons why LaSalle guards routinely fail to monitor detainees and conduct their state-mandated checks is because there are not enough of them to do the job. Likewise, staffing shortages play a role in nurses failing to check vital signs and disregarding time-consuming medical protocols. It is also one of the reasons why LaSalle fails to take inmates to the hospital, even when they are suffering from life-threatening medical needs. When an inmate is taken to the hospital, it requires a guard to be posted by the inmate's room. If the jail has staffing shortages, it cannot afford to lose the manpower it would lose if an inmate is hospitalized. Insufficient staffing practices at the Bi-State Jail and other LaSalle-run facilities caused harm to multiple inmates in the years leading up to Mr. Cole's confinement, and such practices played a substantial role in causing his injuries.

78.     One of the most glaring systemic deficiencies is LaSalle's medical observation policy, which is plainly unconstitutional as implemented. When LaSalle identifies an inmate with serious medical needs, the corporate policy is to place the inmate in a medical observation cell. In theory, this is appropriate. However, when LaSalle places an inmate on medical observation, zero medical monitoring takes place. Instead, corrections officers with no medical training or experience are put in charge of monitoring them. And their so-called medical monitoring consists of guards quickly peeking in the cells—often while walking by without stopping. They are not trained to look for abnormal signs or symptoms, ask questions of the inmates, carefully examine them, or document any observations. Instead, they are told not to summon care so long as the inmates were alive and breathing. And because of LaSalle's persistent under staffing problems, guards routinely fail to conduct even these perfunctory checks. LaSalle's "medical observation" policy led to disastrous results in the case of Michael Sabbie, Morgan Angerbauer, William Jones, Holly Barlow-Austin, Albert Wrightner and others. Despite these negative outcomes, the company made no effort to correct this plainly unconstitutional policy, and, predictably, Raymond Larry Cole became its latest victim.

79.     LaSalle also has a longstanding practice of denying medication and medical care to sick or injured inmates based on their alleged "refusal" to receive the medicine or care. Yet, in many instances, the inmates are too hurt or ill to physically get up to receive the medication or medical care. Moreover, LaSalle has a longstanding practice and corporate culture of treating inmates as "fakers," accusing them of feigning illness or distress when they report medical problems, and assuming all inmates fit into this description—even when they are displaying objectively abnormal vital signs and symptoms. Each of these longstanding practices predictably caused harm to inmates

in the years leading up to Mr. Cole's confinement, and each of them played a substantial role in causing his injuries.

80.     Additionally, LaSalle-run facilities have a longstanding practice of poor medical record-keeping and miscommunication among jail medical providers. This has been a major problem at the Bi-State Jail—where medical records are routinely lost, and communication breakdowns are commonplace. Lower-level nurses often fail to convey important information about patient-inmate care needs to one another and to higher-level providers. These practices predictably put inmates at substantial risk of serious harm. They, in fact, contributed to negative outcomes for multiple inmates, including Michael Sabbie, Morgan Angerbauer, William Jones, Holly Barlow-Austin and Albert Wrightner, and they played a substantial role in Mr. Cole's constitutionally deficient care and negligent treatment.

81.     As was the case with other inmates who died in LaSalle-run facilities, the failure to provide and secure needed medical care for Mr. Cole was motivated, in part, by constitutionally impermissible profit-driven reasons. The Corporate Defendants had a practice of submitting unrealistically low bids to get jail contracts. After securing the contracts, they would then cut costs, or keep their budgets unrealistically low, to make money. This included hiring inexperienced jail guards and lower-level nurses and failing to invest in adequate training. It also included spending inadequate amounts on correctional medical care and habitually under staffing its facilities. It was foreseeable that LaSalle's inadequate training, insufficient medical spending, and under staffing would cause harm to inmates and detainees in need of medical care. In fact, these reckless profit-driven practices resulted in substantial harm to multiple inmates in the years leading up to Mr. Cole's confinement. And these same unconstitutional and negligent practices caused his injuries.

82.    The Corporate Defendants and their employees and agents had a duty to treat Mr. Cole in accordance with the applicable constitutional, medical, and correctional standards of care. The Corporate Defendants breached those duties, and Mr. Cole's damages, including his pain and suffering, were the direct and foreseeable result of the unconstitutional and negligent actions and inactions alleged herein. The Corporate Defendants are liable for their own negligent actions and for the negligent actions of their employees and agents described herein.

83.    The corporate policies, practices, and customs described above were the moving force behind Mr. Cole's injuries and the constitutional violations alleged herein. The Corporate Defendants also ratified the unconstitutional conduct of its employees and agents in connection with the Mr. Cole's injuries. LaSalle policymakers were aware of his condition and participated in the decision not to order and deliver his medications as ordered by his treating doctors. In addition, following Mr. Cole's death, LaSalle engaged in deceptive actions to cover up what happened. This included altering and/or modifying portions of Mr. Cole's medical file.

84.    All acts and omissions committed by the Corporate Defendants and their employees and agents were committed in violation of applicable standards of care and with intent, malice, deliberate indifference, and/or with reckless disregard for Mr. Cole's federal constitutional rights. And the acts of and omissions of the Corporate Defendants caused the damages alleged herein.

85.    Moreover, the conditions in which LaSalle confined Raymond Larry Cole were inhumane in the extreme, beyond all bounds of human decency, in flagrant violation of his constitutional rights, and a gross breach of the applicable standards of care. Housing him in such deplorable conditions was arbitrary, purposeless, unreasonable, and bore no reasonable relationship to any legitimate penological or government objective. This caused Mr. Cole's substantial harm in

the form of unnecessary suffering and death.

**C.     Additional Facts Applicable to Bowie County**

86.     Defendant Bowie County delegated its final policy-making authority to the Corporate Defendants. Despite this, Bowie County had a continuing duty to ensure that its corporate policymakers were meeting the constitutional needs of its detainees. Bowie County adopted and ratified the policies, customs, and practices of the Corporate Defendants as its own. As such, Defendant Bowie County is liable for any unconstitutional corporate policies, customs, or practices that resulted in harm to any detainees and inmates confined in the jail, including those that caused the injuries to Raymond Larry Cole. It was foreseeable that such policies, customs, and practices would put the lives of Bi-State Jail and detainees at risk, and such policies and customs caused and/or substantially contributed to the injuries sustained by Raymond Larry Cole.

87.     Bowie County is also liable for failing to regularly inspect the Bi-State Jail to ensure that LaSalle was meeting its constitutional obligations. Given the highly publicized evidence of how inmates were being treated, including those who died in the years leading up to 2020, Bowie County was on notice that LaSalle was not complying with minimal constitutional standards. It had a constitutional duty to remedy the situation, and it breached its duty.

**V.**
**CAUSES OF ACTION**

**A.     Against the Corporate Defendants**

**1.     42 U.S.C. § 1983**

88.     Based on the allegations in this complaint, the Corporate Defendants (LaSalle and LaSalle Management) are liable under 42 U.S.C. § 1983 for violating Cole's rights under the Eighth and Fourteenth Amendments to the United States Constitution. This includes depriving Raymond

Larry Cole of his constitutional rights to adequate medical care and to be housed in humane conditions of confinement, as well as depriving his surviving family members of their constitutional liberty interest in their relationship and their society and companionship with him.

    **2.**    **State Wrongful Death/Survival**

    89.    Based on the allegations set forth in this complaint, the Corporate Defendants LaSalle and LaSalle Management) are liable for wrongful death and survival laws under the states of Texas and Arkansas for tortiuously causing the pre-death pain and suffering of Raymond Larry Cole by violating the applicable correctional and medical standards of care.

    90.    The Corporate Defendants are liable under the state laws of Texas and Arkansas for their own negligent conduct and for the negligent conduct of their employees and agents, whether named or unnamed in this complaint.

**B.**    <u>**Against Bowie County**</u>

    91.    Based on the allegations in this complaint, Bowie County is liable under 42 U.S.C. § 198 for violating the plaintiff's rights under the Eighth and Fourteenth Amendments to the United States Constitution. This includes deprivingRaymondLarry Cole of his constitutional rights to adequate medical care and to be housed in humane conditions of confinement, as well as depriving his surviving family members of their constitutional liberty interest in their relationship and their society and companionship with him.

**C.**    <u>**Against the Individual Defendants**</u>

    **1.**    **42 U.S.C. § 1983**

    92.    Based on the allegations in this complaint, all individual defendants are liable under 42 U.S.C. § 1983 for violating the plaintiff's rights under the Eighth and Fourteenth Amendments

to the United States Constitution. This includes depriving Raymond Larry Cole of his constitutional rights to adequate medical care and to be housed in humane conditions of confinement, as well as depriving his surviving family members of their constitutional liberty interest in their relationship and in their society and companionship with him.

93.     Individual liability under 42 U.S.C. § 1983 also extends to the supervisory defendants identified herein, including Defendants Bowman and Spivey for their allure to oversee their subordinates and ensure compliance with correctional standards of care as described in this complaint.

**2.     State Wrongful Death/Survival**

94.     Based on the allegations set forth in this complaint, the individual defendants are liable under the wrongful death and survival statutes of Texas and Arkansas for violating their applicable correctional and medical standards of care and negligently causing the death and pre-death suffering of Raymond Larry Cole.

**VI.**
**DAMAGES**

95.     As a direct and proximate result of Defendants' conduct set forth herein, Plaintiff is entitled to recover damages for:

a.      The pre-death pain and suffering of Raymond Larry Cole;

b.      The value of Raymond Larry Cole's loss of life;

c.      Funeral and burial expenses;

d.      Medical expenses incurred prior to the death of Raymond Larry Cole; and

e.      Damages to the heirs of Raymond Larry Cole for the loss of relationship, society and companionship they sustained as a result of his unnecessary death.

## VII.
## PUNITIVE DAMAGES

96.     Defendants knew, or should have known in light of the surrounding circumstances, that their conduct would naturally and probably result in injury and yet continued such conduct with reckless disregard of the consequences from which malice may be inferred. Defendants intentionally pursued a course of conduct for the purpose of causing injury. Accordingly, Plaintiff seeks an award of punitive damages against the LaSalle Defendants and Individual Defendants.

## VIII.
## ATTORNEY'S FEES

97.     It has become necessary for Plaintiff to retain the services of the undersigned attorney to prosecute the claims asserted herein. Accordingly, Plaintiff request that the Court award him reasonable and necessary attorney's fees incurred in the prosecution of this action.

## IX.
## DECLARATORY RELIEF

98.     Plaintiff seeks a declaratory judgment from the Court concerning Plaintiff's rights and Defendants' liability established by the United States Constitution and federal and state statutes and law referenced herein. Specifically, Plaintiff requests this Court to declare that the Municipal defendant, Bowie County, Texas have non-delegate duties to operate the Bi-State Jail and Annex in a manner that complies with the constitutional and statutory requirements set forth above; and that the Municipal Defendant is therefore liable to Plaintiff for damages sustained as a result of actionable conduct on the part of the non-municipal Defendants as described herein.

## X.
## PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court award her the following relief:

a.    The pre-death pain and suffering of Raymond Larry Cole;

b.    The value of Raymond Larry Cole's loss of life;

c.    Funeral and burial expenses;

d.    Medical expenses incurred prior to the death of Raymond Larry Cole; and

e.    Damages to the heirs of Raymond Larry Cole for the loss of relationship, society and
      companionship they sustained as a result of his unnecessary death.

f.    Punitive damages against the LaSalle and Individual Defendants;

g.    Declaratory relief as set forth herein above;

h.    Attorney's fees and costs;

i.    Pre-judgment interest as appropriate; and

j.    Any such other and further relief as this Court deems just and equitable.


September 30, 2022

                              Respectfully submitted,

                              */s/ W. David Carter*

                              _____

                              W. David Carter
                              Texas State Bar No. 03932780
                              MERCY ✶ CARTER, L.L.P.
                              1724 Galleria Oaks Drive
                              Texarkana, Texas 75503
                              Telephone: (903) 794-9419
                              Fax.: (903) 794-1268
                              wdcarter@texarkanalawyers.com

                              ATTORNEYS FOR PLAINTIFF